FRANK LLOYD PARKS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent
Parks v. Commissioner
Docket No. 571-70.
United States Tax Court
T.C. Memo 1973-38; 1973 Tax Ct. Memo LEXIS 250; 32 T.C.M. (CCH) 175; T.C.M. (RIA) 73038; February 14, 1973, Filed Eugene J. Moran, for the petitioner. H. Stephen Kesselman and Fred L. Baker, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined a deficiency in income tax and additions to the tax to be due from 2 the petitioner for *251 the taxable year 1964, as follows: Deficiency
$24,654.04
Additions:
sec. 6651(a) [1]
6,163.51
sec. 6653(a)
1,232.70
sec. 6654
690.31
The issues presented for our determination are: (1) Whether the petitioner had taxable income in the amount of $51,081.87 in the taxable year 1964. (2) Whether the petitioner is liable for the 25 percent addition to the tax provided by section 6651(a) for failure to file a return for the taxable year 1964. (3) Whether the petitioner is liable for the 5 percent addition to the tax provided by section 6653(a) for negligence or intentional disregard of rules and regulations in the taxable year 1964. 3 (4) Whether the petitioner is liable for the addition to the tax provided by section 6654 for underpayment of estimated tax in the taxable year 1964. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. The petitioner, Frank Lloyd Parks (hereinafter referred to as "petitioner" or *252 "Parks"), is an individual whose legal residence at the time the petition herein was filed was in West Babylon, New York. During the taxable year 1964, petitioner was married and had three infant children. For the taxable years 1961, 1962, 1963, and 1965, the petitioner and his wife, Virginia Keller Parks, filed joint income tax returns with the district director of internal revenue, Brooklyn, New York. For the taxable year 1964, no income tax return was filed by the petitioner. 4 G. Everett Parks and Co., Inc. (hereinafter sometimes referred to as "Parks and Co.") was, until June 1965, a registered stock brokerage firm with its main office at 52 Broadway, New York, New York. Mr. G. Everett Parks, the petitioner's father, was the president and majority stockholder of Parks and Co. Petitioner began working at Parks and Co. in 1959 or 1960 as a clerk in the stock trading department. Subsequently, petitioner made trades for Parks and Co. on his own and became a director of the company. During 1964, Parks was the sole active director of Parks and Co., and in fact operated and controlled the business. The payroll of Parks and Co. was discontinued at some point in time *253 in February of 1964. Parks and Co. thereafter surrendered its broker-dealer license in June 1965. During the taxable year 1964, petitioner maintained a nominee brokerage account with Hemphill, Noyes and Company, 8 Hanover Street, New York, New York (hereinafter referred to as "Hemphill") in the name of 5 Mrs. Virginia A. Keller. Virginia A. Keller is the maiden name of petitioner's wife. Transactions in said account included the following: (1) On January 15, 1964, 25 shares of stock in Chrysler Corporation (hereinafter sometimes referred to as "Chrysler") were purchased by Hemphill for the account of Virginia Keller for a total purchase price of $2,173.35. On January 17, 1964, 25 additional shares of stock in Chrysler were received by Hemphill as a dividend for the account of Virginia Keller. On July 8, 1964, the 50 shares of Chrysler were sold by Hemphill for petitioner for $2,448.79. On July 8, 1964, a check was issued to Virginia Keller in the amount of $2,461.29 by Hemphill.That check was received and cashed by Parks. Of this amount $2,448.79 was in payment for the sale of stock of Chrysler referred to above; the remaining $12.50 reflected payment of a previously *254 declared cash dividend by Chrysler. Petitioner received short-term capital gains of $275.44 and dividend income of $12.50 from the sale of the Chrysler stock. 6 (2) On January 2, 1964, 38 shares of Affiliated Fund, Inc., were sold by Hemphill for the account of Virginia Keller. No basis or holding period for this stock has been established by petitioner. On January 29, 1964, a check was issued to Virginia Keller by Hemphill in the amount of $307.42 in payment for the sale of 38 shares of Affiliated Fund, Inc., referred to above. That check was received and cashed by petitioner. Petitioner received short-term capital gains of $307.42 from the sale of the Affiliated Fund, Inc., stock. (3) On April 7, 1964, 200 shares of stock in Ramer Industries (sometimes hereinafter referred to as "Ramer") were received by Hemphill for the account of Virginia Keller. No basis or holding period for this stock has been established by petitioner. On April 8, 1964, the 200 shares of stock in Ramer were sold by Hemphill for petitioner for $1,243.69. On April 8, 1964, a check was issued to Virginia Keller by Hemphill in the amount of $1,256.19. Of this amount $1,243.69 was in payment for *255 the sale 7 of stock of Ramer and the remaining $12.50 represented payment of a previously declared cash dividend by Chrysler. Petitioner received short-term capital gains of $1,243.69 from the sale of the Ramer Industries stock and dividend income of $12.50 from the Chrysler stock referred to above. During the taxable year 1964, petitioner maintained a nominee brokerage account with Packer Investors Corporation, 80 Wall Street, New York, New York (sometimes hereinafter referred to as "Packer"), in the name of Diane Beer. Transactions in said account included the following: (1) Between July 23, 1964 and August 24, 1964, petitioner purchased through Packer for the nominee account of Diane Beer, 1,600 shares of stock in Dero Research Corporation (sometimes hereinafter referred to as "Dero") for a total cost of $4,300. The dates of those purchases, and their amounts, are as follows: No. of shares
Date purchased
Cost
200
7/23/64
$ 525.00
400
8/3/64
1,125.00
400
8/14/64
1,075.00
400
8/18/64
1,075.00
100
8/21/64
243.75
100
8/24/64
256.25
1,600
$4,300.00 8 Between September 1, 1964 and December 16, 1964, petitioner sold through *256 Packer 1,300 shares of the stock in Dero for the total amount of $5,398.40. In payment of those sales, five checks were issued by Packer to Diane Beer in the total amount of $4,805.50. The $592.90 discrepancy between the total amount of the five checks herein referred to and the total amount realized on the sale, $5,398.40, represents an adjustment of this account. Each of these checks was received by petitioner and diverted to his personal use. Petitioner had short-term capital gains of $1,274.25 from the sale of the Dero Research Corporation stock. (2) Between October 16, 1964 and November 12, 1964, 18,555 shares of stock in National Resources Corporation (sometimes hereinafter referred to as "National"), a corporation which transacted no business in 1964 and for whose stock no market existed, were received by Packer from Parks for the nominee account of Diane Beer. No basis or holding period has been established for this stock as petitioner has failed to establish the circumstances under which he acquired that block of stock. 9 Between October 16, 1964 and November 5, 1964, 18,550 shares of the stock in National were sold by Packer for petitioner through the Diane Beer *257 account for $25,650.95. In partial payment of the sales of National, thirteen checks in the total amount of $22,150.95 were issued by Packer to Diane Beer. Each of these checks was received by petitioner and diverted to his personal use. Petitioner received short-term capital gains of $22,150.95 from the sale of this National Resources Corporation stock. During the taxable year 1964, petitioner also maintained a nominee brokerage account with Packer in the name of Virginia Keller. Transactions in said account included the following: (1) On April 7, 1964, 3,500 shares of stock in National were sold by Packer for petitioner through the Virginia Keller account. The net amount realized on this sale was $2,409.70 and a check in that amount was drawn by Packer on April 17, 1964.That check was received by petitioner and diverted to his personal use. On April 14, 1964, 3,500 shares of stock in 10 National were received by Packer from Parks for the Virginia Keller account to cover the sale of April 7, 1964. No basis or holding period has been established for this National stock as petitioner has failed to establish the circumstances under which he acquired this block of stock. *258 Petitioner received short-term capital gains of $2,409.70 from the sale of this National Resources Corporation stock. (2) On March 25, 1964, 22 shares of stock in Birdsboro Steel (sometimes hereinafter referred to as "Birdsboro") were sold by Packer for petitioner through the Virginia Keller account for $109.01. On May 1, 1964, 15 shares of stock in Birdsboro were purchased by Packer for petitioner's Virginia Keller account for $114.75 to cover the sale of Birdsboro. Also on May 1, 1964, 7 shares of stock in Birdsboro were received by Packer from Parks for the Virginia Keller account for which no basis or holding period has been established. This stock was also to cover the March 25, 1964, sale of Birdsboro. Petitioner incurred a short-term capital loss of $5.74 on the sale of the Birdsboro Steel stock. 11 (3) On May 27, 1964, 300 shares of stock in Bristol Dynamics (sometimes hereinafter referred to as "Bristol") were purchased by Packer for petitioner's Virginia Keller account for $499.38. These shares were delivered to petitioner on the same date. On August 6, 1964, 500 shares of stock in Bristol were received by Packer from petitioner for his Virginia Keller account. *259 No basis or holding period for 200 shares of this stock has been established. On August 21, 1964, an additional 100 shares of stock in Bristol were received by Packer from petitioner for the Virginia Keller account for which no basis or holding period has been established. (4) On August 6, 1964, 200 shares of stock in Therm Air Manufacturing (sometimes hereinafter referred to as "Therm Air") were received by Packer from Parks for the Virginia Keller account for which no basis or holding period has been established. On that same date, the 200 shares of stock in Therm Air were sold by Packer for Parks' Virginia Keller account for $535.30, and 200 shares of the stock in Bristol were sold by Packer for Parks' Virginia 12 Keller account for $335.34. Also on August 6, 1964, a check was issued by Packer in the amount of $870.64, in payment of these sales. That check was received by petitioner and diverted to his personal use. Petitioner received short-term capital gains of $2.42 from this sale of Bristol Dynamics stock and short-term capital gains of $535.30 from the sale of the Therm Air Manufacturing stock. (5) On August 7, 1964, 200 more shares of the stock in Bristol were *260 sold by Packer for Parks' Virginia Keller account for $335.38; and a check was drawn by Packer to Virginia Keller in that amount. That check was received by Parks and diverted to his personal use. On August 21, 1964, an additional 200 shares of the stock in Bristol were sold by Packer for petitioner's Virginia Keller account for $310.38; and a check was drawn by Packer to Virginia Keller dated August 20, 1964, in that amount. That check was received by Parks and diverted to his personal use. Petitioner received short-term capital gains of $479.30 from these sales of the stock of Bristol Dynamics. 13 (6) On September 4, 1964, 3,700 shares of stock in IdahoMontana Silver (sometimes hereinafter referred to as "Idaho") were sold by Packer for petitioner's Virginia Keller account for $155.67. On September 21, 1964, 3,700 shares of stock in Idaho were received by Packer from Parks to cover that sale of Idaho. No basis or holding period has been established for this stock. On September 22, 1964, a check was drawn by Packer to Virginia Keller in payment for the sale of Idaho in the amount of $155.67. That check was received by petitioner and diverted to his personal use. Petitioner *261 received short-term capital gains of $155.67 from the sale of the IdahoMontana Silver stock. (7) On November 2, 1964, 12 shares of stock in L. F. Popell (sometimes hereinafter referred to as "Popell") were sold by Packer for Parks' Virginia Keller account; and a check was drawn by Packer to Virginia Keller in the amount of $23.84. That check was received by Parks and diverted to his personal use. 14 On November 4, 1964, 12 shares of stock in Popell were received by Packer from petitioner to cover that sale of Popell. No basis or holding period has been established for this stock. Petitioner received short-term capital gains of $23.84 from the sale of the L. F. Popell stock. On August 24, 1964, two checks were drawn by Packer to Virginia Keller in the amounts of $1,318.25 and $181.25. These checks were received by Parks and diverted to his personal use. An agreement existed between petitioner and one Arnold Mahler, president of Broadwall Securities, Inc., a boiler room operation dealing in high pressure sales of stock at inflated prices (sometimes hereinafter referred to as "Broadwall"), whereby a number of shares of stock in National were to be purchased from Packer by *262 Broadwall for subsequent sale to the public. Under the terms of this understanding, Mahler received a percentage kickback of 31 percent to 34 percent on each sale of National. Packer received no compensation other than a normal broker's commission on each sale. 15 Petitioner has failed to establish the number of shares of National which were sold by Packer to Broadwall pursuant to this plan. At some point in time, the plan was altered by the elimination of Packer's services, and Parks began to deal directly with Broadwall through a nominee brokerage account at Broadwall opened by petitioner in the name of Virginia Keller. An arrangement existed between Parks and Mahler whereby Mahler was to receive a percentage kickback of 31 percent to 34 percent on all sales of stock to the public through this account. Transactions in said account included the following: (1) Between October 8, 1964 and November 23, 1964, 14,400 shares of stock in National were received by Broadwall from Parks for the account in the name of Virginia Keller. No basis or holding period has been established for this stock. (2) Between October 16, 1964 and October 26, 1964, 7,525 shares of stock in Appalachian *263 Resources (hereinafter sometimes referred to as "Appalachian"), 16 were received by Broadwall from petitioner. No basis or holding period for the stock of National or Appalachian has been established, as petitioner has failed to establish the circumstances under which he acquired these blocks of stock. Between October 20, 1964 and November 27, 1964, Broadwall sold for Parks the 14,400 shares of stock in National and the 7,525 shares in Appalachian referred to above, for the total amount of $37,368.91. On the sales of National stock, 5,300 shares were ultimately not paid for by the purchasers and were returned to Parks, resulting in net sales of 9,100 shares of National. On the dates set forth below, checks were drawn by Broadwall to Virginia Keller in the following amounts: Date
Amount
11/5/64
$ 8,390.00
11/5/64
3,757.93
11/9/64
5,520.28
11/9/64
10,500.00
11/23/64
869.64
Total
$29,037.85 17 The checks of November 5, 1964, in the amount of $3,757.93, and of November 9, 1964, in the amount of $5,520.28 were received and cashed by petitioner. The proceeds of these checks were then returned to Arnold Mahler as his kickback in accordance with *264 the plan previously outlined. The checks of November 5, 1964, in the amount of $8,390, of November 9, 1964, in the amount of $10,500, and of November 23, 1964, in the amount of $869.64 referred to above, were received and cashed by petitioner. The proceeds of these checks were retained by petitioner for his own personal use. Petitioner received short-term capital gains of $19,759.64 from the sale of National Resources stock and the stock of Appalachian Resources. (3) On August 21, 1964, 200 shares of stock in Bristol were received by Broadwall from petitioner and sold for $322.88. No basis or holding period for this stock has been established. A check dated August 20, 1964, was drawn by Broadwall to Virginia Keller in the amount of $322.88 in payment of the sale of stock 18 in Bristol. This check was received by Parks and diverted to his own personal use. Petitioner received short-term capital gains of $322.88 from the sale of this Bristol Dynamics stock. In May of 1964, petitioner delivered to Broadwall a block of stock called Fast Line which was subsequently sold to the public for Parks by Broadwall. On June 29, 1964, two checks were drawn by Broadwall to G. Everett *265 Parks and Company in the amounts of $4,000 each, a total amount of $8,000. These checks were both deposited into a G. Everett Parks and Company account at the Commercial Trust Company of New Jersey in Jersey City, New Jersey, on June 29, 1964. Also on June 29, 1964, $4,000 was deposited into petitioner's personal account at the First National City Bank. During the taxable year 1964, petitioner maintained the following special checking accounts: First National City Bank - Account No. 61989982 Chemical Bank New York Trust Company - Account No. 051-528479 Marine Midland Bank - Account No. 1-26233-5 19 During the taxable year 1964, petitioner made deposits into his special checking account at First National City Bank totalling $13,029.90. Of that amount, $8,204 was asserted in the statutory notice as representing gross income. During the taxable year 1964, petitioner made deposits into his special checking account at Chemical Bank New York Trust Company totalling $5,509.35.Of that amount $4,232.03 was asserted in the statutory notice as representing gross income. During the taxable year 1964, petitioner made deposits into his special checking account at the Marine *266 Midland Bank totalling $5,243.92. Of that amount $2,750 was asserted in the statutory notice as representing gross income. During the taxable year 1964, the petitioner received unreported short-term capital gains totalling $54,834.26 and unreported dividend income of $25.00. 20 OPINION In his notice of deficiency, the respondent determined that the petitioner received taxable income in the year 1964 in the amount of $51,081.87, composed as follows: (a) Deposits to petitioner's bank accounts where sources of funds not established
$21,300.25
(b) Income realized from securities accounts with Packer Investors Corp.
29,281.72
(c) Short-term capital gains from sale of securities through Hemphill, Noyes and Company
3,999.90
1964 gross income
$54,581.87
Less standard deduction and dependency exemptions
3,500.00
1964 taxable income
$51,081.87
With respect to the adjustments made by the respondent reflecting amounts received from securities transactions through Hemphill, Noyes and Company and Packer Investors Corporation, we 21 have found as a fact that the petitioner received short-term capital gains in 1964 aggregating $30,751.74. [2] The petitioner *267 does not dispute the existence of nominee accounts through which these transactions were consummated or that the checks therefrom were received and cashed by him, or deposited in his accounts. His sole contention is that these sales were made in liquidation of G. Everett Parks and Co., a contention which does not find support in the record. In addition to the foregoing transactions, from the evidence before us we find that the petitioner received additional short-term capital gains from transactions with Broadwall Securities, Inc., during the taxable year 1964 aggregating $24,082.52. 22 As was previously the case, petitioner does not dispute the existence of the nominee account *268 with that firm through which the transactions were consummated, nor does he deny the receipt of the checks in payment of those transactions. From the testimony of the petitioner and one of respondent's witnesses, it is clear that some of those checks represented "kickbacks" to the Broadwall frim or an officer thereof. Those checks have not been charged as income to the petitioner. Also resulting from petitioner's dealings with Broadwall was a $4,000 deposit to his checking account at the First National City Bank on June 29, 1964. The respondent originally asserted that this deposit constituted gross income because the source of that deposit had not been established. It now appears, however, that the source of the deposit was a transaction with Broadwall wherein two checks in the amount of $4,000 each were delivered to petitioner on the same date, June 29, 1964, made payable to G. Everett Parks and Co., a company which had by then become a one-man 23 operation run solely by Frank Lloyd Parks. The conclusion is inescapable that the $4,000 deposited to the petitioner's account represented the proceeds from the sale of securities by Broadwall on petitioner's behalf. Therefore, *269 that $4,000 deposit has been included in the amount of short-term capital gains resulting from petitioner's transactions with Broadwall Securities. At the trial, and in his brief, the respondent contended the proper amount to be included as unidentified bank deposits was $15,186.03 [3] rather than $21,300.25 as asserted in the statutory notice. Under section 446(b), the Commissioner is authorized, where "no method of accounting has been regularly used by the taxpayer," to compute the taxpayer's taxable income under such method as clearly reflects income. It is axiomatic, therefore, that where the taxpayer employs no method of accounting at all, as 24 evidenced by a total absence of books and records, the Commissioner may act under the statute using whatever method will clearly reflect income. See Harold E. Harbin, 40 T.C. 373 (1963). Regardless of the method so employed, such as here where the respondent utilizes a hybrid "bank deposits" and "specific items" method, the requirement *270 that the chosen method clearly reflect income is applicable to the Government as well as the taxpayer. Bradstreet Co. v. Commissioner, 65 F. 2d 943 (C.A. 1, 1933). Only the exactitude with which the income is reconstructed is subject to variance, for mathematical precision would impose an impossible burden on the Government. See Harold E. Harbin, supra at 377, and cases there cited. In the instant inquiry, we are not convinced that the use of the "bank deposits" method, in conjunction with the "specific items" previously discussed, clearly reflects income. Total deposits to the petitioner's checking accounts in January 1964, which the respondent asserts were "unexplained," amounted to $2,553.42. The petitioner 25 testified, and the respondent admits, that on December 13, 1963, he received a bank loan in the net amount of $24,620. Of that amount, the petitioner testified that $20,000 was loaned to a third party and that $2,900 (as evidenced by a check in that amount drawn to "cash") was withdrawn and redeposited in small amounts in his checking accounts through the month of January. Without comment upon the veracity of certain other testimony *271 given by the petitioner, there is no basis upon which we may disregard these statements. As stated in O'Dwyer v. Commissioner, 266 F. 2d 575, 588 (C.A. 4, 1959), "All taxpayers had to do in order to overcome the presumption of correctness was to make some reasonable explanation as to the source and nature of the deposit in question." Here, petitioner has made a reasonable explanation, supported in part by documentary evidence. His testimony on this specific point has not been contradicted and "it is not within our province arbitrarily to disregard" it. Jay A. Williams, 28 T.C. 1000, 1001 (1957); 26 Edward Warner, 56 T.C. 1126 (1971). Accordingly, deposits to petitioner's checking accounts during the month of January 1964 do not constitute gross income. With respect to the deposits for the balance of the year 1964, we are unconvinced that they constitute gross income. That the use of the "bank deposits" method of reconstructing the petitioner's taxable income was unreliable in this proceeding, is apparent from the development of the case itself. The statutory notice asserted that the petitioner had realized income from three sources; *272 accounts with two brokerage houses and the unidentified bank deposits. Subsequent thereto, the respondent became aware of substantial transactions with a third brokerage firm. The information so discovered was so apparent and uncontradicted that the parties stipulated it. This information accounts for the largest single deposit ($4,000 on June 29, 1964) which the respondent had previously considered "unexplained." 27 From the foregoing, it is apparent that the petitioner had more than adequate funds available to him from which to make the bank deposits remaining, in the respondent's view, to be "unexplained." Having determined that the petitioner received "specific items" of income totalling $54,834.26, the source of the remaining deposits of $8,632.61 cannot with certainty be said to represent additional income and we do not believe that petitioner's taxable income would be "clearly reflected" by the inclusion of the remaining bank deposits. The opposite is more likely the case.In the aggregate, it becomes clear to this Court that petitioner did, in fact, receive unreported income substantially as determined, but it is established by reason of specific items of short-term *273 capital gains, not by the "unexplained" bank deposits. Accordingly, the respondent's determination that the foregoing bank deposits, with the exception of the $4,000 deposit of June 29, 1964, constitute taxable income is erroneous. However, his determination that Frank Lloyd Parks received 28 unreported gross income in the amount of $54,581.87 is correct and decision will be entered accordingly. [4]
respondent has also determined various additions to the tax to be due from the petitioner.
Having determined that petitioner received unreported short-term capital gains totalling $54,834.26 and dividend income of $25 during the taxable year 1964, petitioner's justification for not filing a return *274 for that year on the ground that his gross income did not exceed $600 is without merit. He has not shown that his admitted failure to file a return was "due to reasonable cause and not due to willful neglect." as required by section 6651(a) (1). Accordingly, the addition to the tax determined for the taxable year 1964 for failure to file a tax return is sustained. addition to the tax is required where any part of the underpayment (as defined in section 6653(c)) is due to the taxpayer's negligence or intentional disregard of rules and regulations. That addition was asserted in the statutory notice, but petitioner addressed no evidence thereto. The respondent must therefore be sustained. James S. Reily, 53 T.C. 8 (1969). The petitioner also addressed no evidence to the addition asserted by the respondent under section 6654 for underpayment of estimated tax. That addition, likewise, must therefore be sustained. Myrtle Berlin, 42 T.C. 355 (1964). Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Despite repeated extensions of the time within which to do so, the petitioner filed no brief in this case. Consequently, we cannot determine what, if any, objections the petitioner may have to respondent's requested findings, which we have substantially adopted. See Florence L. Klein, Et Al., 6 B.T.A. 617 (1927); Allan A. Seserman, T.C. Memo. 1962-191↩. Petitioner's position on the various issues presented herein has been discerned from the record where practicable. 3. There is a discrepancy in this amount. Respondent's brief asserts the amount of $15,386.03, while his opening statement, and the stipulation of facts, refers to $15,186.03. ↩
4. The amount of unreported income established at the trial exceeds the amount of gross income, $54,581.87, determined by the respondent in his statutory notice. However, respondent's motion for leave to file an amended answer wherein an increased deficiency was to be claimed, within 30 days after the completion of the trial, was denied by this Court on the ground that it was not timely. Therefore, the deficiency herein can be no greater than that initially determined by the respondent. ↩